UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DANIEL RODRIGUEZ, | No. CV 11-9011-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on November 2, 2011, seeking review of the Commissioner's denial of his application for Supplemental Security Income payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on December 5, 2011, and December 16, 2011. Pursuant to the Court's Order, the parties filed a Joint Stipulation on August 16, 2012, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on December 22, 1960. [Administrative Record ("AR") at 157.] He has an eleventh grade education [AR at 171], and past work experience as a truck driver helper, store laborer, baker's helper, construction worker, and a kitchen helper. [AR at 32, 56-59, 166.][1]

On November 22, 2000, plaintiff protectively filed his application for Supplemental Security Income ("SSI") payments, alleging that he was unable to work since November 22, 2000, due to mental stress. [AR at 157-60, 164-73.] After his application was denied initially, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 96-99, 104.] A hearing was held on August 14, 2003, at which plaintiff appeared with counsel and testified on his own behalf. [AR at 51-93.] A vocational expert and a medical expert also testified. [AR at 68-90.] On October 24, 2003, the ALJ determined that plaintiff was not disabled. [AR at 31-41.] Plaintiff requested review of the hearing decision. [AR at 25.]

On November 30, 2004, while plaintiff's request for review of the ALJ's decision concerning his application for SSI payments was still pending, plaintiff protectively filed a second application for SSI payments, alleging that he was unable to work since November 1, 2004, due to an affective disorder. [See AR at 460, 710.] That application was granted.[2] [See id.]

On March 11, 2005, the Appeals Council denied plaintiff's request for review of the ALJ's decision concerning plaintiff's first application for SSI payments. [AR at 4-8.] Plaintiff then filed an action in this Court in Case No. CV 05-2643-PLA, challenging the Commissioner's decision. On April 5, 2006, the Court remanded the matter with instructions to evaluate the severity of plaintiff's mental impairment in light of new evidence. [AR at 443-52.] On August 9, 2006, the

---

[1] The ALJ found that plaintiff had no past relevant work experience as of plaintiff's established disability onset date, as he determined that plaintiff did not engage in substantial gainful activity in the 15 years prior to that date. [AR at 686 (citing AR at 764-66).] The Commissioner's regulations define "past relevant work," in part, as work which was "done within the last 15 years." 20 C.F.R. § 416.965(a).

[2] Plaintiff's SSI payments pursuant to that application were terminated in 2005, when he was incarcerated. [See AR at 710, 1159.]

Appeals Council vacated the ALJ's decision and remanded the case for further proceedings consistent with the Court's 2006 Order and for the period prior to November 1, 2004.[3] [AR at 460-61.]

On March 3, 2008, another hearing was held, at which plaintiff did not appear but was represented by counsel. [AR at 652-71.] Testimony was received from two medical experts and a vocational expert. [AR at 656-71.] On April 9, 2008, the ALJ again determined that plaintiff was not disabled. [AR at 409-18.] Plaintiff subsequently filed a second action in this Court in Case No. CV 08-3815-PLA, challenging that decision. While that action was pending, on May 29, 2009, plaintiff protectively filed a third application for SSI payments, alleging that he was unable to work since May 29, 2009. [See AR at 677.] On July 15, 2009, this Court remanded plaintiff's case in Case No. CV 08-3815-PLA for the ALJ to properly consider plaintiff's treating psychiatrist's opinion. [AR at 689-704.] On August 28, 2009, the Appeals Council vacated the ALJ's April 9, 2008, decision, remanded the case for further proceedings consistent with the Court's 2009 Order, and ordered the ALJ to consider whether plaintiff's appeal in that case (concerning his first SSI application) should be consolidated with his third SSI application. [AR at 710-11.]

On January 13, 2011, a different ALJ held a hearing, at which time plaintiff appeared with counsel. [AR at 1155-68.] The ALJ declined to consolidate plaintiff's first SSI application with his third SSI application, and remanded the latter to the State Agency. [See AR at 677, 1164.][4] On March 29, 2011, the new ALJ held a supplemental hearing, at which time plaintiff appeared with counsel and testified on his own behalf. [AR at 1169-1217.] A vocational expert also testified. [AR at 1212-15.] On July 19, 2011, the ALJ determined that plaintiff was not disabled prior to July 3, 2004, but became disabled on that date and continued to be disabled through October 31, 2004. [AR at 676-88.] This action followed.

---

[3] The Appeals Council found no reason to disturb the Commissioner's favorable decision concerning plaintiff's November 30, 2004, second application for SSI payments. [AR at 460.]

[4] Thus, the period at issue in the ALJ's decision and in this action is the period from November 22, 2000, plaintiff's initial alleged disability onset date, to October 31, 2004, the day before the disability determination date in plaintiff's second SSI application (November 1, 2004). [See AR at 676; JS at 5.]

# III.

# **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

# IV.

# **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

## A.  THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity from November 22, 2000, plaintiff's initial application date, through October 31, 2004. [AR at 676, 679.] At step two, the ALJ concluded that from November 22, 2000, through June 4, 2001, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. [AR at 679.] The ALJ also determined that from June 5, 2001, to July 3, 2004, plaintiff had an intermittent explosive disorder, but did not have a severe impairment or combination of impairments because he did not have an impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for twelve

consecutive months. [AR at 680.] For the period between July 3, 2004, and October 31, 2004, the ALJ found that plaintiff had the impairments of intermittent explosive disorder, a depressive disorder not otherwise specified, a psychotic disorder, and an anti-social personality disorder, none of which were severe when considered separately, but which were severe in combination. [AR at 685.] At step three, the ALJ determined that from July 3, 2004, to October 31, 2004, plaintiff did not have an impairment or combination of impairments that met or equaled any of the impairments in the Listing. [Id.] The ALJ further found that during that same time period, plaintiff retained the residual functional capacity ("RFC")[5] to perform a full range of work at all exertional levels but with the following nonexertional limitations: "[plaintiff] was unable to perform work at any exertional level for eight hours per day and 40 hours per workweek without interruption from psychologically[-]based symptoms." [AR at 686.] At step four, the ALJ concluded that plaintiff had no past relevant work as of November 1, 2004, his established disability onset date. [AR at 686, 710.] At step five, the ALJ found, based on the application of the Medical-Vocational Guidelines, that "[b]eginning on July 3, 2004, through October 31, 2004, ... there were no jobs that existed in significant numbers in the national economy that [plaintiff] could have performed." [AR at 687.] Accordingly, the ALJ determined that plaintiff was not disabled prior to July 3, 2004, but became disabled on that date and continued to be disabled through October 31, 2004. [Id.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred by failing to call on the services of a medical expert to testify at the hearing before the ALJ regarding plaintiff's disability onset date. [Joint Stipulation ("JS") at 4-8, 12.] As set forth below, the Court agrees with plaintiff and remands the matter for further proceedings.

/

/

---

[5] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

**FAILURE TO CALL MEDICAL EXPERT TO INFER DISABILITY ONSET DATE**

While the ALJ concluded that plaintiff's mental impairments became disabling on July 3, 2004, plaintiff contends that the evidence regarding plaintiff's disability onset date was ambiguous. [JS at 4-8, 13.] Specifically, plaintiff points to his treatment history, as well as the September 2001 opinion of Dr. Hian Biauw Oey, his treating psychiatrist, to argue that his disability onset date had to be inferred. [JS at 7-8.] Plaintiff contends that as a result, the ALJ was required to call a medical expert to testify at the hearing before the ALJ regarding plaintiff's disability onset date. [JS at 4-8.]

Under the Social Security Act, a claimant is considered disabled when he becomes "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than twelve months." See 42 U.S.C. § 1382c(a)(3)(A). Although plaintiff bears the burden of proving disability, the ALJ in a social security case has an independent "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)); see also Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (the ALJ has a duty to fully and fairly develop the record where the evidence is ambiguous, and this duty is "heightened where the claimant may be mentally ill and thus unable to protect [his] own interests").

In addition, Social Security Ruling[6] 83-20 states, in relevant part:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

\*\*\*

---

[6] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

> [I]t may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. ...

SSR 83-20. The Ninth Circuit has held that "[i]f the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 *requires* the ALJ to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination." Armstrong v. Comm'r of Social Sec. Admin., 160 F.3d 587, 590 (9th Cir. 1998) (citing DeLorme v. Sullivan, 924 F.3d 841, 848 (9th Cir. 1991), and Morgan v. Sullivan, 945 F.3d 1079 (9th Cir. 1991)) (emphasis added). "Rather than just inferring an onset date … SSR 83-20 requires that the ALJ create a record which forms a basis for that onset date." Armstrong, 160 F.3d at 590. "The ALJ can fulfill this responsibility by calling an ME or … exploring lay evidence." Id.

Here, in concluding that plaintiff's disability began on July 3, 2004, the ALJ determined that the evidence concerning plaintiff's disability onset date was not ambiguous. That determination by the ALJ, however, was premised on his finding that plaintiff did not have a severe impairment prior to July 3, 2004. Specifically, for the period between June 5, 2001, and July 3, 2004, the ALJ found that plaintiff had an intermittent explosive disorder ("IED"), but did not have a severe impairment or combination of impairments because: (1) "the record ... reveals that [plaintiff's] treatment was generally successful in controlling [his] symptoms"; (2) plaintiff was "not ... entirely compliant in taking prescribed medications or following suggested treatment, which suggests that his symptoms may not have been as limiting as he alleged"; (3) plaintiff "cancelled or failed to show up for doctor appointments on a number of occasions, again indicating that he did not believe his symptoms were severe enough to warrant consistent treatment"; (4) "Dr. Oey's opinion ... is just a snapshot of [plaintiff's] temporary level of functioning"; and (5) the ALJ "accept[ed] the opinion of the State Agency [physician] that within twelve months of June 5, 2001, [plaintiff's] intermittent explosive disorder was not severe." [AR at 682-83.] For the reasons discussed below,

substantial evidence does not support the ALJ's determination that the evidence unambiguously establishes that plaintiff's mental impairments were not disabling between June 5, 2001,[7] and July 3, 2004.

First, in concluding that "the record ... reveals that [plaintiff's] treatment was generally successful in controlling [his] symptoms," the ALJ pointed to plaintiff's testimony that the Zyprexa he had taken[8] helped him to "sleep better" and "controll[ed] [him] a little better" [AR at 682, 1191]; a March 19, 2002, progress note completed by Dr. Oey of the Pacific Clinics stating that plaintiff had reported his "[m]edic[ations] calm[] [him] down some, relax[] [him]" [AR at 349, 682]; and a January 28, 2004, Parole Outpatient Clinic case note stating that plaintiff "[a]ppears to be managing well." [AR at 682, 1138.] In relying on this evidence, however, the ALJ ignored plaintiff's testimony that even when he was taking Zyprexa, he would still lose his temper "[w]hen a disrespect issue [arose] or [when] somebody tried to get it out with [him]" [AR at 1192]; evidence in the March 19, 2002, progress note that plaintiff was "still biting his nails" and "angry a lot" [AR at 349]; and plaintiff's testimony that at the parole clinic, "[he did not receive any] therapy with [a] psychiatrist" and "all [the doctor did was] give [him] medication." [AR at 1195.] There is no evidence that the parole clinic physician performed an examination of plaintiff on January 28, 2004, before stating that he "appear[ed] to be managing well." [See AR at 1138.] Moreover, Dr. Oey stated in progress notes dated September 11, 2001, and December 18, 2001, that plaintiff was "still ang[ered] easily, depressed, paranoid, [and] nervous," and that he "still gets angry easily, paranoid, [and] depressed," respectively. [AR at 353, 357.] An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the record that bolster his findings. See Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998) (it is impermissible for

---

[7] On June 5, 2001, plaintiff was seen at Pacific Clinics for the first time, during which a Dr. Tuller performed a mental status examination of plaintiff and completed an Adult Initial Assessment for him. [AR at 367-71.] In the Initial Assessment, Dr. Tuller diagnosed plaintiff with intermittent explosive disorder, rule out antisocial personality disorder, and referred plaintiff for a follow-up evaluation with Dr. Oey, as well as to an anger management group. [AR at 371.]

[8] Plaintiff testified that his doctors later took him off Zyprexa "because of [his] hepatitis C." [AR at 1191.]

9

the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"); see also Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence"). Thus, this first reason by the ALJ to conclude that plaintiff did not have a severe impairment prior to July 3, 2004, is not supported by substantial evidence.

Second, the ALJ noted that plaintiff had "not been entirely compliant in taking prescribed medications or following suggested treatment," which he found "suggests that [plaintiff's] symptoms may not have been as limiting as he alleged." [AR at 682.] While the ALJ noted that a December 17, 2001, Pacific Clinics progress note stated that plaintiff "did not [follow up] on referral to anger management group" [AR at 354, 682], plaintiff testified that he "went to" the group, but that "they didn't want [him] there no more [sic] because people felt intimidated." [AR at 1189.] The ALJ did not mention this portion of plaintiff's testimony. [See AR at 682.] The ALJ also pointed out that on December 18, 2001, Dr. Oey noted that plaintiff was only taking his prescribed dosages of Paxil and Buspar twice a day instead of the prescribed three times a day [compare AR at 353 with AR at 355]; on February 5, 2002, Dr. Oey noted that plaintiff was only taking one Zyprexa at bedtime instead of the prescribed two at bedtime [AR at 350]; and on April 10, 2002, after plaintiff missed an appointment on April 9, 2002, a staff member from Pacific Clinics sent plaintiff a letter concerning appointments and "the importance of medication compliance." [AR at 346, 682.] The ALJ did not, however, mention that in progress notes dated February 5, 2002, March 19, 2002, April 12, 2002, April 19, 2002, April 23, 2002, and April 30, 2002, Dr. Oey and other staff members at Pacific Clinics saw plaintiff and indicated that he was "[a]dherent to [m]edication." [See AR at 339, 341-42, 344-45, 349-50.] In addition, while the ALJ relies on the cited evidence to conclude that plaintiff's "symptoms may not have been as limiting as he alleged," the record also reflects that on April 19, 2002, plaintiff "walked in[]to" Pacific Clinics because he was "shorted" on Zyprexa such that he did not have enough to last him until his next appointment on April 29, 2002, and scheduled an appointment for April 22, 2002, to obtain more [AR at 344]; on April 23, 2002, the day after his wife had an emergency Caesarean section, plaintiff went into the clinic because he needed more Zyprexa [AR at 341]; and on April 30, 2002,

plaintiff visited the clinic again because he had run out of Zyprexa once more. [AR at 339.] That plaintiff took the initiative to schedule an appointment so that he would not run out of one of his medications, visited the clinic the day after his wife had an emergency Caesarean section in order to refill that medication, and subsequently returned again when he needed another refill, undercuts the ALJ's determination that plaintiff's medication intake does not support his allegations concerning the severity of his symptoms. Thus, the evidence identified by the ALJ does not warrant the conclusion that plaintiff did not have a severe impairment prior to July 3, 2004.

Next, the ALJ similarly concluded that plaintiff did not believe that his symptoms were severe because he "cancelled or failed to show up for doctor appointments on a number of occasions," pointing to missed appointments with Pacific Clinics on April 9, 2002, April 22, 2002, April 29, 2002, and June 26, 2002. [AR at 683.] However, the record reflects that plaintiff had legitimate reasons for missing these appointments. On April 12, 2002, plaintiff went into the clinic and explained that he had missed his appointment on April 9 because he had "no transportation" on that day. [AR at 345.] On April 23, 2002, plaintiff went into the clinic again and explained that he had not shown up for his appointment on April 22 because his wife had had an emergency Caesarean section on that day. [AR at 341.] The Pacific Clinics progress note dated April 30, 2002, states that plaintiff missed his appointment from the day before "because of confusion about the time." [AR at 339.] Finally, plaintiff again did not show up for an appointment with Pacific Clinics on June 26, 2002 [see AR at 338], but the record reflects that he was then serving a 180-day sentence in the Los Angeles County Jail, imposed on May 15, 2002.[9] [AR at 197-202.] Accordingly, plaintiff's missed appointments do not constitute a proper reason to conclude that "[plaintiff] did not believe his symptoms were severe enough to warrant consistent treatment." [AR at 683.

/

/

/

---

[9] Following the completion of that sentence, plaintiff served a consecutive 178-day sentence in the Los Angeles County Jail. [AR at 205-07.]

Fourth, the ALJ concluded that Dr. Oey's September 11, 2001, assessments concerning plaintiff's work limitations due to his impairments[10] were "just a snapshot of [plaintiff's] temporary level of functioning," because "[w]ithin twelve months of June 5, 2001, [plaintiff] responded favorably to medications," "stopped treatment," and was "reportedly doing well" according to an April 12, 2002, Pacific Clinics progress note. [AR at 683.] As discussed supra, substantial evidence does not support the first of these reasons to conclude that Dr. Oey's opinion applied to plaintiff for only a "temporary" period. In addition, plaintiff was incarcerated on May 15, 2002, and thus the ALJ's notation that plaintiff "stopped treatment" within twelve months of June 5, 2001, is a mischaracterization of the evidence, which was error. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore competent evidence in the record in order to justify his conclusion). Finally, while plaintiff stated on April 12, 2002, "I'm doing good -- I just need the transportation help" (referring to the fact that he had missed his April 9, 2002, appointment due to lack of transportation) [AR at 345], the Court stated in its July 15, 2009, Order in Case No. CV 08-3815-PLA, that "[w]hile there is some indication in the record that plaintiff's condition improved with medication after Dr. Oey rendered his opinion on September 11, 2001, there is also evidence

---

[10] As the Court discussed in detail in its July 15, 2009, Order in Case No. CV 08-3815-PLA, remanding that case to the Commissioner because the first ALJ had improperly rejected Dr. Oey's opinion, Dr. Oey completed an Evaluation Form for Mental Disorders and a Mental Work Restriction Questionnaire concerning plaintiff on September 11, 2001. [AR at 331-36, 695-97.] In completing the Evaluation Form, Dr. Oey performed a mental status examination of plaintiff and diagnosed plaintiff with IED and rule out personality disorder. [AR at 334, 336.] Dr. Oey also indicated in the Evaluation Form that plaintiff had trouble with his concentration level and memory, and had trouble taking orders; that he had a hard time interacting with others and was easily frustrated and angry; that he had difficulty remaining focused for long periods of time and understanding simple written and oral instructions; and that he would have difficulty adjusting to stresses common to the work environment due to his symptoms. [AR at 334-35.] In the Questionnaire, Dr. Oey opined that plaintiff was: moderately impaired in his ability to remember work-like procedures, understand and remember short and simple instructions, and carry out short and simple instructions; markedly impaired in his ability to, among other things, maintain attention for two-hour segments, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, make simple work-related decisions, and respond appropriately to changes in a work setting; and severely impaired in his ability to work in coordination with or in close proximity to other people without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. [AR at 331-32.]

in the record to suggest that plaintiff's condition worsened over time." [AR at 698 (citations omitted).] The ALJ's conclusion that Dr. Oey's September 11, 2001, assessment of plaintiff's work limitations was "just a snapshot of [plaintiff's] temporary level of functioning" is not supported by substantial evidence, and thus was not an adequate basis for the ALJ to find that plaintiff did not have a severe mental impairment prior to July 3, 2004.

Finally, the ALJ stated that he "accept[ed] the opinion of the State Agency medical consultant that within twelve months of June 5, 2001, [plaintiff's] intermittent explosive disorder was not severe," citing State Agency physician Dr. Charles Stone's July 18, 2001, Psychiatric Review Technique ("PRT"). [AR at 683; see also AR at 317-30.] In the PRT, Dr. Stone noted the following: "6-01 Initial eval[uation] by PhD at Pacific Clinics[;] [diagnosis of] Intermittent Explosive Disorder.... Durational is indicated, medically expected to be non[-]severe by 6-02." [AR at 329.] Similarly, in a Consultation Request that Dr. Stone completed on the same day, he stated that "[a]lthough poor imp[ulse] control may be severe, [plaintiff's] condition may be expected to be non-severe with approp[riate] [treatment] and therapy within 12 mo[nth]s." [AR at 315.] The Court observes that Dr. Stone's opinion was made without any examination of plaintiff, relied only on Dr. Tuller's June 5, 2001, Initial Assessment, and was rendered *before* plaintiff was treated at Pacific Clinics from July 2001 through April 2002. [See AR at 315-30.] In other words, it was the *prospective* opinion of a non-examining physician, based on his review of a *single* treatment record. As such, the Court finds that Dr. Stone's opinion also does not constitute substantial evidence to conclude that plaintiff did not have a severe impairment prior to July 3, 2004.

For the same reasons the ALJ erred in concluding that plaintiff did not have a severe impairment prior to July 3, 2004, the ALJ also erred in concluding that the evidence is unambiguous as to when plaintiff's mental impairments became disabling. The ALJ found that plaintiff's mental impairments became disabling on July 3, 2004, citing records that a social worker at the Arcadia Mental Health Center ("AMHC") diagnosed plaintiff on July 3, 2004, with IED, a psychotic disorder not otherwise specified, as well as an anti-social personality disorder [AR at 1095], and that an AMHC psychiatrist diagnosed plaintiff with the same disorders on July 13, 2004, as well as with depressive disorder not otherwise specified, among other things. [AR at 685,

1052.] Between July 3, 2004, and October 31, 2004, the period for which the ALJ found disability, plaintiff presented with paranoid delusions [AR at 1051, 1092], irritability [AR at 1152], aggression [AR at 1051], an excessive display of anger [id.], poor impulse control [id.], antisocial behavior [id.], depression [AR at 1153], anxiety [id.], and visual and auditory hallucinations. [AR at 1051, 1092, 1152, 1154.]  His doctors prescribed him with Buspar, Paxil, and Zyprexa, as well as one additional medication.  [AR at 1048, 1061.]  Plaintiff's diagnoses, symptoms, and prescribed medications during his period of disability significantly overlap with those reflected in the treatment records prior to July 3, 2004.  As noted supra, plaintiff's treating psychiatrists at the Pacific Clinics diagnosed him in as early as June and July 2001 with IED, depression, anxiety, and rule out antisocial personality disorder.  [AR at 307, 371.]  Upon performing mental status examinations of plaintiff between June 5, 2001, and March 19, 2002, they found that plaintiff had symptoms of paranoia [AR at 334, 350, 353, 357], irritability [AR at 370], aggression [AR at 306], an excessive display of anger [AR at 306, 370], poor impulse control [AR at 306, 334, 370], antisocial behavior [AR at 306], depression [AR at 353, 357], and anxiety.  [AR at 306, 334, 350.]  The only major symptom not present in plaintiff's medical records prior to July 3, 2004, that was present during the period for which the ALJ found disability is that of visual and auditory hallucinations (Pacific Clinics progress notes dated October 30, 2001, February 5, 2002, and March 19, 2002, report that plaintiff expressly denied any hallucinations on those dates).  [AR at 349-50, 355.]  In addition, plaintiff's treating psychiatrists at the Pacific Clinics treated him with Buspar, Paxil, and Zyprexa until he was incarcerated in May 2002 [see AR at 339-59], and plaintiff was also prescribed those same medications at the Parole Outpatient Clinic between December 17, 2003, and April 21, 2004.  [See AR at 1137, 1139-40.]  The substantial overlap between plaintiff's diagnoses, symptoms, and treatment for the period prior to July 3, 2004, and the period for which the ALJ found disability, supports plaintiff's contention that his mental impairments were slowly progressive impairments within the meaning of SSR 83-20.  That contention is further supported by plaintiff's report of visual and auditory hallucinations after July 3, 2004, in addition to his symptoms that

manifested both before and after that date.[11]  Based on the record, it is not at all clear when plaintiff's mental impairments became disabling, and the ALJ should have called a medical expert to assist in determining the date of onset of disability.  See Armstrong, 160 F.3d at 590 (where the record demonstrated that the plaintiff suffered from various impairments prior to the date for which the ALJ found onset of disability, but did not demonstrate when those impairments became disabling, the ALJ should have called a medical expert to aid in determining the date of disability onset) (citing Morgan, 945 F.3d a 1082-83; DeLorme, 924 F.2d at 848-49).  Remand is warranted.

/
/
/
/
/
/
/
/
/
/
/
/
/

---

[11]  In light of the lack of treatment notes for the period between March 19, 2002, and November 4, 2003 (during which plaintiff was incarcerated for the majority of the time), and plaintiff's limited treatment at the Parole Outpatient Clinic between November 5, 2003, and April 21, 2004 (plaintiff visited the clinic three times to obtain medication, and testified that "[he did not receive any] therapy with [a] psychiatrist" there [AR at 1137, 1139-40, 1195]), it may be that plaintiff began experiencing hallucinations earlier than July 3, 2004.  To the extent that the ALJ assumed, based on the absence of treatment notes in the record reporting hallucinations prior to July 3, 2004, that they did not begin until that date, such an assumption may have been improper. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) ("it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (internal quotations and citation omitted).

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate for the ALJ to call a medical expert to testify concerning plaintiff's disability onset date. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: October 11, 2012

/s/ Paul L. Abrams
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE